[No. 28243. Department Two. April 2, 1941.]

BAY CITY LUMBER COMPANY, *Respondent,* v. S. M. ANDERSON, JR., *et al., Appellants.*[1]

[1] Reported in 111 P. (2d) 771.

192

Rummens & Griffin, for appellants.

L. B. Donley and Gladys Phillips, for respondent.

JEFFERS, J.—This is an appeal by defendants S. M. Anderson, Sr., S. M. Anderson, Jr., and wife, from a judgment entered by the superior court for Grays Harbor county, in favor of plaintiff, Bay City Lumber Company.

The complaint alleged that, during the years 1927, 1928, and 1929, while S. M. Anderson, Sr., was president and general manager of plaintiff company, and S. M. Anderson, Jr., his son, was assistant manager, defendants, in their official capacity, entered into a contract for the production and sale of fuel wood produced at the mill, for the consideration and at the rate of twenty dollars per day of eight hours fuel wood production, and ten dollars per night of eight hours fuel wood production, and exacted and collected a secret bonus from the purchaser of the fuel of five dollars per shift of eight hours, which defendants received and converted to their own use, in the sum of $5,270.79, between May 6, 1927, and February 6, 1929. It was further alleged that, to conceal their acquisitions and appropriations, checks were made monthly by the purchaser of the fuel to S. M. Anderson, Jr., and kept from the knowledge of plaintiff, and that plaintiff had no knowledge of such transactions until about

six months before this action was instituted, which was February 21, 1939.

Defendants by their answer denied generally the allegations of the complaint purporting to charge them with illegal acts, and alleged affirmatively that, if defendants, or either of them, were ever indebted to plaintiff, as alleged in the complaint, the statute of limitations has long since run and is a bar to any action.

Bay City Lumber Company was incorporated in 1912, and has been in the business of manufacturing lumber, in Aberdeen, since that time. The stock was held, one-third by Polson Logging Company, and two-thirds by the Anderson and Middleton families. S. M. Anderson, Sr., was president and general manager of the company, from its incorporation in 1912, up to 1935. During the period last above mentioned, the mill was almost entirely under the management of the Andersons.

The five trustees of plaintiff company, from 1912 to 1930, were S. M. Anderson, Sr., H. N. Anderson, G. E. Anderson (brothers), Alex Polson, and A. W. Middleton. In 1930, S. M. Anderson, Jr., replaced A. W. Middleton, and H. N. Anderson, Jr., replaced H. N. Anderson. In 1931, the trustees were the same as in 1930, and in 1932, F. A. Polson replaced his father, Alex Polson, on the board, and in 1935, became president of the company, which position he has since occupied.

S. M. Anderson, Jr., went to work for the company about 1919, and in 1920, became assistant to his father. In 1935, when his father ceased to be president of the company, he became general manager, in which position he continued until about February, 1939, when he was discharged by F. A. Polson, the then president of the company.

While certain sections of the by-laws were read into the record, it nowhere appears what officers were named in the articles of incorporation or the by-laws, or what their duties were.

The corporation held annual meetings, and kept a minute book, but very little appears therefrom, so far as this record shows, the book not being before us, but only reference made thereto. In so far as this record shows, in all the years S. M. Anderson, Sr., was president and general manager, the books contain just one reference to salary, and that is a record made in 1918, when the salary of the manager was fixed at eight hundred dollars a month.

It appears beyond question that, during the time S. M. Anderson, Sr., was president and manager of plaintiff company, he and his brothers were the operating heads of the company, and that Alex Polson, representing the Polson interest, and A. W. Middleton did not interfere with this operation in any way; that about the only time they participated in the affairs of the company was at the annual meeting, when they met to collect their dividends and elect officers. The company was prosperous during the period S. M. Anderson, Sr., was in control of its affairs. In 1927, the company made a net profit of $155,485.26, based on a gross of $2,324,211.53; in 1928, a net profit of $165,261.21, based on a gross of $2,135,988.43; in 1929, a net profit of $226,715.21, based on a gross of $2,-420,583.03. Between January 21, 1917, and January 13, 1931, dividends in the sum of $730,000 were declared.

It further appears that, through the years S. M. Anderson, Sr., was president and manager, he fixed salaries and paid bonuses, and his actions in this regard were not questioned.

Prior to 1927, plaintiff company had a contract with

Aberdeen Fuel Company, in regard to the fuel wood produced by the mill. Concerning the situation existing at the mill relative to fuel wood, S. M. Anderson, Sr., testified as follows:

"Well, at that time we had a contract with the Aberdeen Fuel Company, who was trying to take care of the offals of the Bay City Lumber Company, and they had one truck and a team and they couldn't any more take care of the capacity of that mill than anything in the world. Our conveyors would get so congested it would all go out into this refuse burner and we could run along probably until on a Friday night of the week and then we would be down for a Saturday and Sunday, clearing out the burner, to be ready to go on a Monday morning. And it was very costly in the handling of our offals and shut down. I told Sam that he would have to make some other arrangement with the handling of those offals and which he set out and did."

Mr. Anderson further testified that Sam, Jr., informed him that he had made an arrangement with Grays Harbor Fuel Company, and what the arrangement was, and that the deal was talked over with his brothers before it was finally made. After being so instructed by his father, Sam, Jr., took the matter up with Mr. Phipps, one of the partners operating the Grays Harbor Fuel Company, and a deal was made, after Phipps and Anderson, Jr., had gone over the mill and agreed to some changes, the cost of such changes to be borne equally by the mill and the fuel company. The fuel company agreed to pay forty dollars a day for the wood fuel from the plant. It appears from the testimony of Anderson, Sr. and Jr., that for his services in procuring this agreement, S. M. Anderson, Jr., was to receive five dollars a shift, or ten dollars a day, as additional salary or a bonus.

It appears without contradiction that this agreement with the fuel company was of considerable benefit to

the mill, in that the fuel company took care of the wood fuel in such a way that the mill did not have to close down, which was worth a hundred dollars a day to the mill.

From 1926 to 1936, one R. L. Manuell was accountant and bookkeeper of plaintiff company, and had active charge of all the books and files. Beginning with May 6, 1927, and each month thereafter, to and including February 6, 1929, Mr. Manuell wrote a letter on company stationery to the fuel company. The letters are practically the same, except for amounts and certain deductions contained therein. The letter of May 6, 1927, is as follows:

"Grays Harbor Fuel Co.
"Aberdeen, Wash.
"Gentlemen:

"Herewith two invoices for fuel for the month of April and other charges as per agreement between yourselves and Mr. S. M. Anderson Jr.

"In remitting will you kindly make two checks. One for $812.61 payable to the Bay City Lumber Company and another for $236.55 payable to Mr. S. M. Anderson Jr. and oblige

> "Yours very truly,
> "BAY CITY LUMBER COMPANY.
> "By"

Mr. Manuell testified he signed all of these letters and prepared two invoices to accompany each letter, one showing the hour basis for the amount due the company, and the other showing the hour basis at the rate of five dollars per day shift and five dollars per night shift, for the amount due S. M. Anderson, Jr. Carbon copies of the above letters and invoices, marked plaintiff's exhibits D to Z, inclusive (with the exception of exhibit E, which is a ledger sheet), were introduced by plaintiff. The exhibits were shown to have been in the regular files of plaintiff corporation

from the time they were written to the time this suit was instituted, and accessible to the trustees and officers of the company.

On receipt of the above letters, the fuel company mailed two checks to plaintiff, one payable to the company and one payable to S. M. Anderson, Jr. These checks were sent in the same envelope, and were received by Mr. Manuell, who deposited the company check in the bank of the company, and turned the other check over to S. M. Anderson, Jr., who would endorse the same and give it to the timekeeper to deposit for him. The S. M. Anderson, Jr., check did not go through the books of the company, and no record was made of the wood transaction, other than as indicated by the above letters and invoices and a letter confirming the agreement with the fuel company under date of April 2, 1927, a copy of which remained in the files of the company until 1937 or 1938. While this letter did not set out the way the payments were to be made by the fuel company, it did refer to an agreement between the parties.

There was no entry in the minute books of the corporation showing any action by the trustees authorizing the additional salary or bonus to S. M. Anderson, Jr. We might state here that, so far as this record shows, the only entry in the minute books which shows any action by the trustees on the salary of S. M. Anderson, Jr., during all the time he was with this company, was an entry made on January 19, 1938, after S. M. Anderson, Sr., had ceased to be president and manager, whereby the board authorized a bonus of $5,242.01, to be paid to S. M. Anderson, Jr., for the year 1937. The salary of S. M. Anderson, Jr., was fixed by his father during the time S. M. Anderson, Sr., was president and manager, as were the

salaries of the other employees, and Anderson, Sr., testified he also fixed and paid bonuses.

In his deposition taken before the trial, S. M. Anderson, Sr., testified he discussed with his brothers the wood deal and the amount his son was to receive, and had their approval, but that he did not discuss it with the other directors. When called as a witness at the trial, S. M. Anderson, Sr., testified he talked the matter over with all the directors, and that it was discussed in board meeting, and they all knew that Sam, Jr., was getting ten dollars a day from the wood deal, and the matter was never questioned. He explained the testimony given in his deposition by saying that what he referred to then was conversation before the deal was closed, and that he did not talk with Middleton or Polson until after the deal was made. We may state here that this would seem to be in keeping with the way the affairs of the mill were handled, the Andersons being in active charge, and so far as this record shows, their actions were never questioned by either Polson or Middleton.

At the time of this trial, S. M. Anderson, Sr., was the only director and trustee on the board during the years 1927, 1928, and 1929, still living and competent to testify. As we have stated, F. A. Polson, son of Alex Polson, went on the board in 1932, and became president in 1935. He testified that, until about six months before this action was instituted, he had no knowledge that S. M. Anderson, Jr., had received part of the proceeds from the sale of wood to the fuel company. H. N. Anderson, Jr., who came on the board in 1936, and who had no connection with the corporation prior to that time, testified to the same effect.

We desire at this point to call attention to certain testimony, whereby it was attempted to be shown that

the officers of Polson Logging Company knew nothing of the way the wood deal was handled. The following question was asked F. A. Polson, by Mr. Donley:

"Q. So far as you know from your connection with the Polson Logging Company did yourself or any other officers, so far as you know, know of the transaction?"

The following then occurred:

"Mr. Griffin: That is objected to as irrelevant, incompetent and immaterial. What can he know about what any other officer knows?

"Mr. Donley: I am asking as to his knowledge.

"Mr. Griffin: It is utterly immaterial.

"The Court: Yes, I think so,—tell what he knows.

"Mr. Donley: Well I am asking what he knows, if he knows; first, what he got himself; second, if he knows of any information owing to the others.

"Mr. Griffin: That would be hearsay.

"The Court: If he was present and heard it, it would be all right, otherwise the only way you can get it would be by hearsay.

"Mr. Donley: I am proving a negative situation.

"Mr. Griffin: That is immaterial.

"The Court: He may answer to that, that he didn't know about anybody else knowing.

"Q. Did you know if any of the rest of them knew it? A. No, I did not."

There was no direct testimony other than that given by F. A. Polson and H. N. Anderson, Jr., upon which plaintiff could base its claim that Alex Polson and Mr. Middleton did not know about the wood deal.

It further appears that neither S. M. Anderson, Sr., nor S. M. Anderson, Jr., knew how the wood deal was handled as a bookkeeping transaction, and Mr. Manuell was not sure from whom he received the information from which to write the letters and prepare the invoices, but thought it was from S. M. Anderson, Sr. or Jr.

S. M. Anderson, Jr., never denied receiving the amount of money claimed by plaintiff, and at the trial admitted he received it. There was no testimony that S. M. Anderson, Sr., ever received a cent of this money, and his only connection with the deal was that he authorized his son to make it, and authorized the additional salary or bonus of ten dollars a day to S. M. Anderson, Jr.

It further appears that, immediately upon the termination of the wood contract in February, 1929, the salary of S. M. Anderson, Jr., was raised three thousand dollars a year, and no complaint has been or is made of such action in this case.

The trial court found that S. M. Anderson, Jr., received and converted to his own use, between May 6, 1927, and February 6, 1929, the sum of $5,270.79; that, during the period when the money was received by Anderson, the then board of trustees consisted of S. M. Anderson, Sr., H. N. Anderson, G. E. Anderson, A. W. Middleton, and Alex Polson; that, of these trustees, A. W. Middleton, Alex Polson, and H. N. Anderson, at least, never at any time had any knowledge of the course of conduct of S. M. Anderson, Sr., and S. M. Anderson, Jr., complained of in this action; and that the acts of the defendants were not discovered by the Bay City Lumber Company until the fall of 1928 (1938 undoubtedly meant).

The court concluded that plaintiff was entitled to judgment against defendants in the sum of $5,270.79, and interest from the date of collection of each item at the rate of six per cent. Judgment was entered accordingly. After motion for new trial by defendants had been made and denied, this appeal by defendants followed.

Appellants claim the court erred in not dismissing the action for failure of proof; in not dismissing the

action because barred by the statute of limitation; in entering finding of fact No. 5, "that the acts of defendants were not discovered by Bay City Lumber Company until the fall of 1928;" in concluding that appellants received a "secret bonus," and that the transaction constituted fraud; in entering its conclusion of law No. 1, "that the acts of S. M. Anderson and S. M. Anderson, Jr., complained of in this action constituted a secret profit and a fraud against Bay City Lumber Company and its stockholders;" in not entering judgment of dismissal upon findings of fact and conclusions of law proposed by appellants; and in denying appellants' motion for new trial.

Were appellants entitled to a judgment of dismissal? The theory of respondent, which was adopted by the trial court, as indicated by conclusion of law No. 1, was that this payment to S. M. Anderson, Jr., "constituted a secret profit and a fraud against Bay City Lumber Company and its stockholders." Appellants contend that it was neither the one nor the other; that it was a simple business transaction; and that there was nothing secret about it.

Whether or not, as a bookkeeping proposition, these checks made out to S. M. Anderson, Jr., were handled as respondent contends they should have been, we are satisfied there was nothing secret about the deal at any time. It is impossible for us to believe, after carefully reading this record, that either S. M. Anderson, Sr., or S. M. Anderson, Jr., ever intended to cover up the way this deal was taken care of, or to keep it from the trustees of the corporation. The letters were all written by the bookkeeper, and copies kept at all times in the files; the checks were sent to the bookkeeper, and the Anderson check deposited by the timekeeper. The entire transaction was handled openly and aboveboard. In so far as this record shows, there

were, in the files of the company at all times for some twelve years, records from which it could have been determined that S. M. Anderson, Jr., received this money; at least, there were records which would have given a clue to the transaction. Whether any of the trustees did or did not examine the books and files of the company, does not appear; however, there was no reason shown why they could not have done so had they desired to. Neither does it appear that there was any reason why F. A. Polson, who went on the board in 1932, and became president in 1935, could not have examined the files. Mr. Manuell was still the bookkeeper, and continued in that capacity until about 1937.

We think it may be stated as a general proposition, which needs no citation of authority to support it, that the trustees of a corporation in charge of its affairs are presumed to know of the corporate acts.

Assuming that the basis of this action is fraud, and that S. M. Anderson, Sr., and S. M. Anderson, Jr., were acting in a fiduciary relation to the corporation, respondent must allege, and the burden is upon it to prove, the fraud, and the burden does not shift to appellants because of the claimed fiduciary relation. *Reeves v. Davis & Co.*, 164 Wash. 287, 2 P. (2d) 732.

It is contended by respondent that S. M. Anderson, Sr., had no authority to fix or increase his son's salary, or to pay him a bonus out of corporate funds. This contention is based upon the further contention that S. M. Anderson, Jr., was an officer of the company, as it is not contended that S. M. Anderson, Sr., as president and general manager, could not fix the salaries of employees, other than officers. In support of this contention, respondent read into the record § 2, Art. V, of the by-laws, which provides in part: "No officer of the company shall receive any

compensation for his services except the same be first fixed by the board of trustees." As we have stated, the by-laws were not introduced, but only parts thereof read into the record.

It does not appear from this record what officers were provided for by the articles or the by-laws, or what the duties of any officer were. Certainly we might assume that a president, and possibly a general manager, were officers provided for and referred to in the by-laws, but we do not believe we can assume that an assistant to the manager is an officer, within the contemplation of the above by-law, in the absence of direct evidence to that effect.

Subject to certain limitations, a corporation can, by custom, usage, or acquiescence, or by unanimous consent and continuous action, change or modify any by-law. 2 Thompson on Corporations (3d ed.), 523-530. Unless prevented by charter or statutory provisions, and subject to the qualification that vested rights cannot be taken away or impaired, a corporation has the power at any time, to alter, amend, or repeal by-laws adopted by it. It may also waive them, and this it may do expressly or impliedly. If it acts or contracts in disregard of a by-law with the consent or acquiescence of the stockholders or members, that is a waiver of the by-laws. 3 Clark & Marshall, Private Corporations, 1951, 1952. Nonuse of a by-law by corporate officers, continued for a sufficient length of time to bring it home to the stockholders, will work its abrogation. *Blair v. Metropolitan Savings Bank,* 27 Wash. 192, 67 Pac. 609; *Huxtable v. Berg,* 98 Wash. 616, 168 Pac. 187.

S. M. Anderson, Sr., testified that, during the entire time he was president and general manager, salaries were fixed only as he fixed them. There was only one exception to this procedure, in so far as the minutes

of the corporation showed, and that was on January 1, 1918, when the minutes indicated that the board fixed the salary of the general manager at eight hundred dollars per month. It must be assumed that, through all the years, the acts of S. M. Anderson, Sr., in fixing salaries, were known to the trustees, and concurred in by them, and that such acts so long continued must also have been known to the stockholders.

We have, then, a situation where it is not shown that S. M. Anderson, Jr., was an officer of the corporation, and therefore the provision of the by-laws would not apply to him; but even assuming that he was an officer, the corporation, by a long course of conduct in allowing S. M. Anderson, Sr., to fix salaries and pay bonuses, had in effect waived the provision of the by-laws.

█ Was the amount received by S. M. Anderson, Jr., a legitimate salary increase or bonus, and not a secret profit and a fraud against respondent company?

We have heretofore discussed the matter of secrecy. We are satisfied the amounts received by S. M. Anderson, Jr., did not constitute a secret profit, as that term is used by the text writers and in the cases, but in our opinion, under the facts of this case, the ten dollars per day received by S. M. Anderson, Jr., was a legitimate salary increase or bonus, for services rendered to the company, which services were of benefit to the company.

We admit that the rule contended for by respondent, that a corporate officer will be held to strict accountability for any individual profits made by him in dealing with assets of the corporation, is correct; but that rule, when applied to the facts in this case, does not justify the conclusion that appellants received any secret profits in this case.

Respondent cites several cases to sustain its contention that this transaction was a secret profit and a fraud on the company, among them the case of *Parsons v. Tacoma Smelting & Refining Co.*, 25 Wash. 492, 65 Pac. 765, which deals with the relation and duties of a director, and states that the acts of a corporation, when consummated by the necessary vote of an interested trustee, are voidable upon complaint of a stockholder. We are in accord with the rule announced, but it was based upon facts entirely different from the facts in the instant case.

Respondent also cites *Baker v. Seattle-Tacoma Power Co.*, 61 Wash. 578, 112 Pac. 647, Ann. Cas. 1912C, 859, and quotes therefrom as follows:

"The trustees of a corporation stand in a fiduciary relation to the corporation, and are to be regarded as its agents to transact its business for the benefit of its stockholders; that so standing and so acting, all their acts must be for the benefit of the corporation, and not for their own benefit; and if by their acts they receive any profit from the corporation's business, equity will regard such profit as the property of the corporation."

However, the court then stated:

"As an abstract statement of a legal proposition, that such is the law will readily be admitted; but like every other rule of law, it must be concreted with proper facts, before it will be announced as the law in any given case."

The court then held the rule not applicable to the facts in the cited case. The case is not applicable herein.

It should be kept in mind that S. M. Anderson, Jr., was not a trustee of this corporation during the time involved herein. It is true his father was, but as we have stated, there is no evidence that the father received any part of the money paid S. M. Anderson, Jr., or that he received any personal benefit, or as a stock-

holder, other than the benefit received by all the stockholders by virtue of the saving to the mill, effected by eliminating the congestion at the mill and consequent shut-downs.

The case of *Thompson v. Mitchell*, 128 Wash. 192, 222 Pac. 617, is another case typical of those cited by respondent. In the cited case, two trustees of a corporation, who had entire control of that organization, secretly, through a representative, purchased an admitted claim of sixty-eight thousand dollars against the corporation, for twenty-five thousand dollars, and then through a dummy, attempted to collect for their own benefit the full amount of the claim. It appeared at the trial that the trustees furnished the money, and were in fact the owners of the claim, and the court allowed recovery in the sum of twenty-five thousand dollars only, the amount paid. Respondent in its brief quotes quite extensively from the cited case. The case was rightly decided, and the rule therein announced was applicable to the facts of that case, but is not controlling in the instant case.

Respondent cites other authority relative to the right of minority stockholders, and also authority to the effect that the guilty knowledge of S. M. Anderson, Sr. and Jr., will not be imputed to the corporation. While we do not believe the facts in this case warrant the conclusion that there was any guilty knowledge on the part of appellants, neither do we believe it is necessary to depend alone on the knowledge of appellants to show the corporation had knowledge of the wood deal.

In view of the fact that respondent, in its brief, seemed to rely so much on the claimed secrecy with which this deal was made, and discussed that matter at such length, we have given it considerable attention, but we are satisfied that secrecy in itself, if there was such, would not make wrongful an act rightfully done,

unless there were other facts in addition to the secrecy which tended to show an unlawful transaction, as in the *Mitchell* case, *supra.*

Believing as we do that it was not shown that, in this transaction, either S. M. Anderson, Sr., or S. M. Anderson, Jr., received a secret profit, or committed any act of fraud against the corporation, but, on the contrary, that the evidence preponderates in favor of our conclusion that S. M. Anderson, Sr., had the authority to allow and fix this additional salary or bonus, that the deal was open and fair, and that the amount received by S. M. Anderson, Jr., was for services rendered the corporation, from which the corporation and its stockholders benefited, it probably is immaterial whether or not it be shown that Alex Polson and A. W. Middleton were actually consulted relative to the wood deal. However, we are satisfied that they were informed of the transaction, at least after it was made, and made no objection thereto. Further, we are of the opinion that, when all the facts are considered, the presumption that all the trustees did know about the deal is so strong that that conclusion is inescapable, in the absence of direct testimony that they did not know.

We therefore conclude that the evidence preponderates against the finding of the trial court, and the conclusion based thereon, that the acts of appellants constitute a secret profit and a fraud against respondent, and that respondent is entitled to judgment against appellants. So concluding, it follows that a judgment of dismissal should have been entered in favor of appellants.

■ ■ We are also of the opinion this action is barred by the statute of limitations.

We again assume, as contended by respondent, that this action is based on fraud, and that Rem. Rev. Stat., § 159 [P. C. § 8166], subd. 4, which reads:

"An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party *of the facts constituting the fraud,*" (Italics ours.)

is applicable, if facts have been established which bring the case within the statute.

In this case, the aggrieved party, if any, was the corporation, not F. A. Polson. During the years 1927, 1928, and 1929, the trustees in charge of the affairs of this corporation were the men hereinbefore mentioned. The fraud, if any, occurred when S. M. Anderson, Jr., received the payments from the fuel company. The first payment was received May 6, 1927, and a payment was received each month thereafter, up to and including February 6, 1929. Unless the statute of limitations was tolled by affirmative proof that the corporation did not discover the alleged fraud until within three years next before the bringing of this action, a cause of action accrued against defendants on the date of each payment, and the statute of limitations would have run against a cause of action on the last payment made on February 6, 1929, three years thereafter. This action was not started until February 23, 1939.

The case of *Reeves v. Davis & Co.,* 164 Wash. 287, 2 P. (2d) 732, discusses at some length the statute hereinbefore referred to, and the rule relative to the burden of proof in such cases. It is there stated that it is necessary, in order to state a cause of action, that the time of the discovery of the fraud be alleged; that it necessarily follows that it is incumbent upon the plaintiff to prove that allegation in order to make out a case; and that the same reason exists for placing upon the plaintiff the burden of showing the time when he discovered the fraud, in a case where a fiduciary relation exists, as it does in any other case.

The only proof offered by respondent in this case, for the purpose of showing that the corporation did not discover the alleged fraud until the latter part of 1938, is to be found in the testimony of F. A. Polson, that *he* became suspicious after his talk with Mr. Fovargue, and that *he* did not discover how the deal was handled until after the audit of the books. In addition, it will be recalled that Mr. Donley stated he was proving a "negative situation," and thereupon F. A. Polson testified that so far as he knew, the other officers of the Polson Logging Company did not know about the transaction.

H. N. Anderson, Jr., who did not become a trustee until 1936, and who knew nothing of the affairs of the corporation prior to that time, testified that he did not know about the transaction until informed by F. A. Polson, who showed him a report of the audit.

There was no proof by respondent that the trustees of the corporation for the years 1927, 1928, and 1929, or those subsequently elected, did not know about the transaction, the only affirmative proof being that F. A. Polson did not know about it, and that H. N. Anderson, Jr., did not know about it.

We again refer to the case of *Reeves v. Davis & Co., supra*. We are of the opinion that what was there said relative to Mr. Reeves is applicable to the trustees in the instant case. We quote:

"There being no evidence that Mr. Reeves did not know of the fraud, if there were fraud, until less than three years prior to the time the action was begun, there was a failure of proof in this regard, which was an essential element for the respondents to allege and prove. . . .

"There being a complete failure of proof of one of the essential elements of the case, the action cannot be sustained."

It was incumbent upon respondent to establish that the corporation did not have knowledge of this transaction until within three years next before this action was brought, and this, in our opinion, it failed to do.

In conclusion, we desire to call attention to the case of *Henroid v. Henroid,* 198 Wash. 519, 89 P. (2d) 222, wherein we discussed subd. 4, § 159, Rem. Rev. Stat., citing many cases. We therein quoted from *Noyes v. Parsons,* 104 Wash. 594, 177 Pac. 651, as follows:

" 'The broad assertion that the statute does not run until the fraud is discovered is not tenable. The statute begins to run when the fraud should have been discovered, and a clue to the fact which, if followed up diligently, would lead to discovery, is in law equivalent to discovery.' [Citing cases.]"

We refer to this case in view of the facts, which we have hereinbefore set out, relative to the condition of this record in regard to the files of the company. When these facts are considered together with the presumption that the trustees of a corporation know of the corporate acts, the conclusion, as we have said, is almost inescapable that the corporation did know of this transaction, during the time S. M. Anderson, Jr., was receiving the money, and if it did have such knowledge, the statute of limitations has long since run against this claim.

For the reasons herein assigned, the judgment of the trial court must be and is hereby reversed, and the cause remanded, with instructions to the trial court to enter a judgment of dismissal as to all the appellants.

ROBINSON, C. J., and SIMPSON, J., concur.

BEALS, J. (concurring in the result)—Being of the opinion that the action is barred by the statute of limitations, I concur in the result.

MILLARD, J. (dissenting)—S. M. Anderson, Sr., as president and general manager was without authority under the by-laws of respondent corporation to fix or increase his son's salary, or to pay him a bonus out of the funds of the corporation. Section 2 of Art. V of respondent corporation's by-laws provides that no officer of the company shall receive any compensation for his services except the same be fixed by the board of trustees. The so-called salary increase of S. M. Anderson, Jr., was not fixed by the board of trustees nor was it ever mentioned at a meeting of the board. Both appellants admitted that two of the trustees, A. W. Middleton and Alex Polson, did not have any knowledge of the increase.

S. M. Anderson, Sr., president of respondent corporation, *sanctioned* the increase after talking it over with his two brothers, one of whom was "doing the same thing to Anderson & Middleton," but this *sanction* of the "salary increase" was never mentioned to the other trustees. It is clear that this additional salary arrangement was fraudulent and that it was intended throughout to conceal the transaction. This additional salary arrangement was not made known to all of the trustees and brought before a board meeting and authorized by the board as required by the corporation's by-laws.

The bonus received by S. M. Anderson, Jr., for his services as manager in 1938 was authorized by the board of trustees, as disclosed by the minutes of the trustees' meeting for January 19, 1938. If the "salary increase" of which respondent complains had not been intended as a secret profit and a fraud, the transaction would have been authorized by the board of trustees and the record of authorization would appear in the minutes of the trustees' meeting. If it had not been intended to keep this matter secret the question im-

mediately suggests itself to a normal mind, why was the only evidence of the sale price of the wood (letter from Mr. Anderson to the fuel company) absent from the office of respondent corporation when the audit was made in October, 1938? The explanation of the absence of that letter from the office for eighteen months is one that would not be accepted by a reasonable mind; it is a patent fabrication which only the most credulous would accept as true.

The majority opinion disregards the long established rule that a corporate officer will be held to a strict accountability for any individual secret profit made by him in dealing with assets of the corporation. A cardinal rule that should be ever present in the mind of a corporate officer is, "Thou shalt not make a personal profit out of your office." In the case at bar, the corporate officer made a contract on behalf of the corporation for the sale of corporate property. A part of the proceeds of the contract was retained by that corporate officer for his own use. This was done not only without authorization from the governing body of the corporation but was done with the sanction of the president-manager, who is the father of the officer making the secret profit.

There was—the evidence abundantly establishes the fact—a fraudulent misrepresentation of what the contract price for the sale of the corporation's wood fuel was to be and a fraudulent concealment, retention, and conversion of part of that sale price. The trial court's finding of fraud is sustained by competent evidence, and that finding, under the rule which we have so frequently announced, will not be disturbed unless we can say from our examination of the record that it is clearly against the preponderance of the evidence.

It will be noted, in the majority opinion, resort is had to a *presumption* "that the trustees of a corpora-

tion know of the corporate acts," which presumption, when considered with the facts in the case, compels the conclusion that the corporation had knowledge of the transaction in question during the time S. M. Anderson, Jr., was receiving the money, therefore "the statute of limitations has long since run against this claim."

The trial court found that respondent corporation did not learn that S. M. Anderson, Jr., had received payments individually from Grays Harbor Fuel Company until the fall of 1938. Counsel for appellants contend that there is no evidence to sustain that finding; that respondent proved no more than the date that F. A. Polson discovered the evidence of the acts of appellants; and that, in the light of the testimony of appellants, all of the trustees of respondent corporation at the time of the questioned acts knew of those acts.

True, S. M. Anderson, Jr., testified at the trial that he had discussed with his two uncles, who were trustees, the fact that he was receiving individually part of the profits of the Grays Harbor Fuel contract. S. M. Anderson, Sr., testified that the matter had been fully and completely discussed at trustees' meetings when all the trustees were present. S. M. Anderson, Sr., testified positively that he had discussed these payments with Alex Polson and A. W. Middleton. It must be borne in mind that this is not all of the testimony. S. M. Anderson, Sr., testified, when his deposition was taken, that the payments to his son were not discussed at the board meetings and that he did not talk to anyone about them except his two brothers, who already were aware of the facts because one of the brothers was doing the same thing to Anderson & Middleton. The testimony of this gentleman at the time his deposition was taken was in conflict with the testimony he gave at the trial, but his deposition was

taken at a time when A. W. Middleton and Alex Polson were living. Mr. Middleton and Mr. Polson were dead at the time of the trial.

It is unnecessary to cite sustaining authority for the rule that the guilty knowledge of S. M. Anderson, Sr., the father, and S. M. Anderson, Jr., the son, was not imputable to the corporation. Mr. Polson and Mr. Middleton did not know that appellants were defrauding respondent corporation, and there was nothing to put them on notice that the Andersons were defrauding respondent; hence, authorities cited by majority are inapposite. The trial court had the benefit of seeing and hearing the witnesses. The trial court found that, of the board of trustees, A. W. Middleton, Alex Polson, and H. N. Anderson never, at any time, had any knowledge of the course of conduct of S. M. Anderson, Sr., and S. M. Anderson, Jr., *who were father and son,* co-conspirators; and that the acts of appellants were not discovered by respondent corporation until the fall of 1938. This finding must stand unless we are ready to discard the rule that a finding of the trial court will not be disturbed unless it is clearly against the preponderance of the evidence.

There is no place, in this case, for the presumption that the trustees of respondent corporation knew of the fraudulent acts of the Andersons—father and son—prior to 1938 in view of the overwhelming evidence that the fraud was committed by the Andersons who saw to it that nothing came to the attention of the trustees before 1938 to put them on notice. The finding of the trial court is sustained by the admissions of appellants. I find no authority which will support reversal of the judgment in this case.

The judgment should be affirmed.